**HATFIELD v. GUAY, U. S. Marshal, et al.** *

No. 3165.

Circuit Court of Appeals, First Circuit.

Jan. 5, 1937.

*Writ of certiorari denied 57 S. Ct. 669, 81 L. Ed. ——.

Allie J. Connor, of Manchester, N. H. (John J. McDonald, of Washington, D. C., on the brief), for appellant.

Daniel F. McCormack, of Boston, Mass. (Edward H. Lockwood, of New York City, on the brief), for appellees.

Before, BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

This is an appeal from a judgment or decree of the federal District Court for New Hampshire, in a habeas corpus proceeding brought to secure the discharge of the petitioner held on extradition proceedings for delivery to Canada. On January 5, 1935, the British Consul General at Boston subscribed and swore to a complaint before United States Commissioner Barnard of New Hampshire, alleging that Hatfield was a fugitive from justice of the Province of Ontario in the Dominion of Canada; that the crimes charged in the complaint were included in existing treaties of extradition between the United States and the British government; and, in separate counts, two distinct and separate offenses were set out.

Following a hearing, the Commissioner found in favor of the complainant; and on the twentieth day of March, 1935, made a report to the Secretary of State setting out the proceedings had before him in the matter, including a specific finding that there was sufficient evidence to sustain the charges and that he had ordered Hatfield committed to abide the order of the Secretary.

Thereafter Hatfield instituted the above-mentioned habeas corpus proceeding to secure his discharge. The District Judge issued certiorari to bring up the Commissioner's record, and after hearing dismissed the petition and remanded the petitioner. This appeal was then taken.

The charge in the first count was: "That on or about March 18, 1931 at Ottawa, Province of Ontario, in the Dominion of Canada and within the jurisdiction of His Britannic Majesty, one Freeman Hatfield did then and there fraudulently, by false pretenses obtain certain moneys, the property of His Britannic Majesty in the right of the Dominion of Canada, being in the amount of * * * ($71,-276.72) by falsely representing that a vessel, known as the 'Gypsum Queen,' was sunk on the high seas by the submarine of an enemy of His Britannic Majesty, whereby and because of which fact the Canadian Government was alleged to be indebted to and owing to him the said Hatfield, the sum of $71,276.72; whereas in truth and in fact the said representations to the said Government were false and fraudulent, and were known to be false and fraudulent when made by the said Hatfield; that the said Government relied upon such false pretenses and such false and fraudulent representations and because of such pretenses and such representations paid or caused to be paid on account of and in payment of such alleged indebtedness on or about March 18, 1931 *moneys* of His Britannic Majesty as aforesaid to the said Hatfield in the sum of $71,276.72; whereby because of said false pretenses and representations the said Hatfield then and there obtained property capable of being stolen, to wit, the said moneys in the said sum of $71,276.72 with the intent to defraud the Canadian Government."

The second count charged: "That on or about March 18, 1931 at Ottawa, in the Province of Ontario and Dominion of Canada and within the jurisdiction of His Britannic Majesty, the said Freeman Hatfield did then and there commit the crime of larceny by the theft or stealing of the sum of * * * ($71,276.72) the same then and there being the property of His Britannic Majesty in the right of the Dominion of Canada."

The Blaine-Pauncefote Convention of 1889 (26 Stat. 1508) between the United States and Great Britain added to the list of offenses named in article 10 of the Webster-Ashburton Treaty of 1842 (8 Stat. 576) the crime of larceny. Subdivision 3 of article 1 of that Convention reads:

"3. Embezzlement; larceny; receiving any money, valuable security, or other property, knowing the same to have been embezzled, stolen, or fraudulently obtained."

In the treaty between the respective governments, known as the Hay-Pauncefote Treaty of December 13, 1900 (32 Stat. 1864) there were added further crimes to the list for which extradition could be had including therein the crime of false pretenses. Subdivision 11 of article 1 of that treaty reads as follows:

"11. Obtaining money, valuable securities or other property by false pretenses."

In the District Court the above provisions of these treaties were regarded as in force between the two governments at the time the complaint in this case was brought on January 7, 1935. But previous to that time a treaty between the two governments, known as the Dawes-Simon Extradition Treaty of December 22, 1931 was ratified on August 4, 1932, the eighteenth article of which provided that the treaty should "come into force ten days after its publication." 47 Stat. 2122–2127. This treaty, on the part of the United States, was published by the Proclamation of the President on the ninth day of August, 1932. It was not published by Great Britain until June 14, 1935, and became of force June 24, 1935. But even after the Treaty of 1931 came into force, by its eighteenth article, article 10 of the Treaty of 1842, the Convention of 1889, the Supplementary Convention of 1900, and the Supplementary Convention of 1905 (34 Stat. 2903) were to remain effective as to the Dominion of Canada until it "shall have acceded to the present treaty in accordance with Article 14," which authorized His Britannic Majesty to "accede to the present Treaty on behalf of any of his Dominions." Article 14. The accession was to be brought about by "notice to that effect given by the appropriate diplomatic representative of His Majesty at Washington," and the Treaty of December 22, 1931, was to become effective, as to Canada, from the date of such notice. We are informed that Canada has not yet acceded to the treaty. This being so the Treaty of 1931 has not become effective between the United States and Canada. It may be said, however, that article 3 of the Treaty of 1931 allows extradition for larceny (article 3, subd. 16) and also for the crime of "obtaining money, valuable security, or goods, by false pretenses" (article 3, subd. 18). It therefore is of little consequence in this case whether the Treaty of 1931, rather than the prior treaties, was in force at the time the complaint was presented to the Commissioner, unless the Treaty of 1931 may contain provisions favorable to Hatfield that the earlier treaties did not.

The Commissioner, in his final mittimus and report to the Secretary of State found specifically that there was sufficient evidence of probable cause to sustain the charges of the crimes of false pretenses and larceny by theft and stealing under the provisions of existing extradition treaties, and his final order committing Hatfield to the custody of the jailer and the keeper of said jail at Manchester, to abide the order of the Secretary of State, included findings that the person arrested was the one demanded, and that he was a fugitive from justice, if there was evidence from which his identity could have been found and that he was a fugitive from justice. It is not claimed that there was no evidence in support of the last two matters.

It is not contended that the crimes of larceny and obtaining money by false pretenses are not specifically named in existing treaties between Canada and the United States. The contentions are (1) that, if the crime of obtaining money by false pretenses is an extraditable offense under existing treaties, the evidence is not such as to warrant a finding of probable cause that Hatfield committed the crime of obtaining money by false pretenses; (2) that the evidence is not sufficient to warrant a finding of probable cause that he committed the crime of larceny in Canada; and (3) that the crime of larceny, as generally understood in this country and included under that term in existing treaties, has not existed in Canada since 1892, either in name, or in the incidents or elements constituting larceny.

The offense of false pretenses charged in the first count is a crime both under the laws of New Hampshire (Pub.Laws N.H. 1926, c. 387, § 1) and of Canada (Canadian Criminal Code, §§ 404, 405).

Section 1, chapter 387 of the New Hampshire statute, so far as here material, reads as follows:

"1. *False Pretenses.* If any person, with intent to cheat or defraud, shall, * * * by means of any false pretense or false token * * * wrongfully obtain any money or other property, * * * he shall be fined not more than five hun-

dred dollars, or imprisoned not more than seven years."

The corresponding sections of the Criminal Code of Canada are:

"404. A false pretense is a representation, either by words or otherwise, of a matter of fact either present or past, which representation is known to the person making it to be false, and which is made with a fraudulent intent to induce the person to whom it is made to act upon such representation."

"405. Everyone is guilty of an indictable offense and liable to three years' imprisonment who, with intent to defraud, by any false pretense, * * * obtains anything capable of being stolen. * * *"

It being a crime to obtain money by false pretenses under the laws of both New Hampshire and Canada and an extraditable offense under the existing treaties between the respective governments, the only question remaining with reference to the extradition of Hatfield under the first count is whether the evidence was such as warranted the finding by Commissioner Barnard that probable cause existed for believing that Hatfield, on the 18th of March, 1931, by false pretenses obtained money from the Canadian government, under circumstances showing that a crime was committed there, knowing that his representations were false and upon which the Canadian government relied, believing them to be true, so that he should be sent there for trial on such a charge.

It appeared that Hatfield, a citizen of Canada, was the master and owner of the Canadian schooner Gypsum Queen; that in July, 1915, during the World War, he was on a voyage from Halifax to England with a cargo of lumber; that, on July 31, 1915, when near the west coast of Ireland, she was abandoned in a sinking condition by the master and crew, who were taken off her by the British steamer Cymric and landed at Liverpool, England; that nearly fifteen years later, on October 29, 1929, Hatfield made a claim upon Canada, signed and sworn to, for damages due to the loss of his ship, in which he stated that the ship was destroyed by a German submarine on the high seas, when, as the Canadian government claims, he well knew she was lost by "stress of weather," as he had deposed in a signed and sworn statement made in Liverpool, pursuant to law, where he was landed some four days after the catastrophy; that a fund applicable to such losses had been paid into the British treasury by Germany under the Treaty of Versailles, which, by an arrangement between Great Britain and Canada, had been made available to the Dominion; that by an Act of the Parliament of Canada the Governor General was authorized to appoint a Commissioner to hear reparation claims that should be made and "to report to our Secretary of State of Canada the result of his investigation together with the evidence taken before him and any opinion he may see fit to express thereon"; that the Commissioner was not authorized to give judgment; that he was authorized to assess the amount of a claim, "leaving the proper authority to deal, as it may deem advisable, with such recommendations as may be made"; that under this Act of Parliament Mr. McDougall was appointed Commissioner to hear this and other like matters.

It further appeared that Mr. McDougall, after being appointed, held several hearings on the Hatfield claim, some in Canada, some in this country; that at a hearing held in Boston Hatfield testified that the Gypsum Queen was sunk by a German submarine, and various members of his crew, by arrangement with him, gave similar testimony, one testifying in Nova Scotia, others at hearings in this country, and others giving evidence by affidavits; that this testimony was not contradicted or impeached at the hearings before the Commissioner; that he accepted the testimony and made a report in Hatfield's favor in the amount of $40,000, which, with interest, amounted to the sum above stated; that on the coming in of the Commissioner's report to the Secretary of State, it was laid on the table in the House of Commons and in the Senate of Canada and was printed; that, according to the testimony of a witness called by Hatfield, the report was printed by order of Parliament, and being so printed meant that it was laid before Parliament, was considered and approved, and as such had the effect of a statute, although it was not an Act of Parliament, and that no steps had been taken by Parliament to set it aside, so far, at least, as it related to the present case; that after the report was laid before Parliament, as above stated, it was submitted to a committee of the Privy Council, which, on March 12, 1931, by an order, directed the payment of Hatfield's

claim as recommended in the Commissioner's report; that this Order in Council was sent to the Secretary of State, the custodian of enemy property, where the amount of the claim was computed and a check and voucher prepared; that this check and voucher were authorized to be sent, as stated in the voucher, to "Capt. Freeman Hatfield, % Hon. H. J. Logan, K. C., Amherst, N. S."; that the check and voucher were dated March 21, 1931; that there was evidence that the check was presented for payment to the Montreal Bank at Ottawa and was paid to Logan, Hatfield's counsel, in the presence of Hatfield, on March 18, 1931, the check having been indorsed by Hatfield—showing that the check and voucher must have been post dated and sent to Logan on or before March 18, when it was presented for payment; that the check was in the amount of $71,276.72, the sum alleged in the complaint to have been obtained by false pretenses; that a little more than four years later, on the 4th of December, 1934, two complaints and warrants were sworn out and issued against Hatfield before a justice of the peace for the county of Carleton and city of Ottawa, one charging that on or about the 18th of March, 1931, at the city of Ottawa in the county of Carleton, Hatfield "did unlawfully, by false pretenses, procure to be delivered by the Bank of Montreal to a person other than himself, to wit, to one Hance J. Logan, the sum of * * * [$71,276.72] of and from the monies of the Consolidated Revenue Fund of Canada, the property of His Majesty the King in the right of the Dominion of Canada, with intent to defraud, contrary to section 405 of the Criminal Code, in such case made and provided"; that the other complaint and warrant, sworn to and issued on that day charged that Hatfield "on or about the 18th day of March, A. D. 1931, at the City of Ottawa, in said County of Carleton, did unlawfully convert to his own use and thereby steal the sum of * * * [$71,-276.72] of and from the monies of the Consolidated Revenue Fund of Canada, the property of His Majesty the King in the right of the Dominion of Canada, contrary to section 386 of the Criminal Code, in such case made and provided."

In addition to the foregoing there was other evidence presented in behalf of the Canadian government tending to prove that the sworn claim of Hatfield which he sent or caused to be sent to the Canadian government setting out that his ship was torpedoed, as well as the testimony that he himself gave before the Commissioner, was false and that the "Gypsum Queen" was in fact lost by stress of weather and not by an attack by an enemy submarine, and that his claim was fraudulent.

Was Commissioner Barnard, with the evidence above narrated before him, authorized in finding that there was reasonable ground to believe that Hatfield obtained the money by false pretenses? There was evidence tending to show that Hatfield, while in the United States, sent or caused to be sent to the Canadian government a false and fraudulent statement of a claim against it concerning the loss of his vessel, which that government acted upon and caused the sum in question to be paid to his attorney at Ottawa while he was there present; and from which it could also be found that the Canadian government, in paying the money to him, did so in reliance upon his fraudulent misrepresentations, believing them to be true; unless, as matter of law, due to the investigation of his claim and the authorization of the Canadian government that it be paid, it must be said that the fraudulent misrepresentations were merged in a judgment or something akin to it and the only conclusion that could be drawn from the evidence is that the Canadian government directed the payment of the claim and paid it solely in reliance on the investigation and report that were made, and not upon the knowingly false representations of Hatfield.

The action of the Canadian government in investigating the claim and authorizing its payment was not a proceeding in a court of law, and there was no judgment based upon the representations in which they could be merged, as counsel for Hatfield seems to contend. It was, therefore, a question of fact whether the Canadian government, at the time it paid the money to Hatfield, did so in reliance upon the false representations or did so solely in reliance upon its investigation and award of payment. See Kelly v. Griffin, 241 U.S. 6, 14, 15, 36 S.Ct. 487, 60 L. Ed. 861.

■ There manifestly was evidence upon which Commissioner Barnard could have found reasonable ground to believe that the Canadian government acted upon the false representations. It undoubtedly would be a matter of defense at a trial in

Canada that, in paying the money to Hatfield, the government did so solely in reliance upon their investigation and award. But with that neither the Commissioner nor this court is concerned.

We are therefore of the opinion that Hatfield is extraditable on the charge of false pretenses contained in count 1.

As to the second count in the complaint before the Commissioner charging that Hatfield was guilty of "larceny by theft and stealing," when the money was paid to him at the bank in Ottawa, it should be noted that the complaint and warrant sworn out and issued against him on the 4th of December, in the police court at Ottawa, and heretofore set forth, did not charge him with "larceny by theft and stealing" as in the second count of the complaint before Commissioner Barnard, but charged that he "did unlawfully convert to his own use and thereby steal the sum of" $71,276.72 contrary to section 386 of the Criminal Code. That is a charge of embezzlement, not of larceny, as generally understood.

The provisions of the Criminal Code of Canada under which that government claims that the crime of larceny, as specified in existing treaties, is defined by Canadian law, are sections 347 and 386, which read:

"347. Theft or stealing is the act of fraudulently and without colour of right taking, or fraudulently and without colour of right converting to the use of any person, anything capable of being stolen, with intent

"(a) to deprive the owner, or any person having any special property or interest therein, temporarily or absolutely of such thing or of such property or interest or

"((b), (c) and (d) not material.)

"2. Theft is committed when the offender moves the thing or causes it to move or to be moved, or begins to cause it to become movable, with intent to steal it.

"3. The taking or conversion may be fraudulent, although effected without secrecy or attempt at concealment.

"4. It is immaterial whether the thing converted was taken for the purpose of conversion, or whether it was, at the time of the conversion, in the lawful possession of the person converting."

"386. Everyone is guilty of an indictable offence and liable to seven years' imprisonment who steals anything for the stealing of which no punishment is otherwise provided or commits in respect thereof any offence for which he is liable to the same punishment as if he had stolen the same.

"2. The offender is liable to ten years' imprisonment if he has been previously convicted of theft."

■ Larceny at common law is an offense in New Hampshire. State v. Snyder, 50 N.H. 150, 153, 155, 157, 158; State v. James, 58 N.H. 67; State v. Goodrich, 46 N.H. 186; Locke v. State, 32 N.H. 106; State v. Arlin, 27 N.H. 116, 126. The statutes of New Hampshire have not changed the incidents essential to the commission of the crime at common law. They have simply altered the severity of the penalty depending upon the value of the property stolen, its nature or the circumstances under which it was stolen, and, in some instances, have enlarged the classification of personal property that may be stolen. Pub.Laws N.H.1926, c. 389, §§ 1, 2, 3, 4, 5 and 6. The provisions of the foregoing statute, in substantially its present form, have been in existence since 1812. Laws of New Hampshire (1915), c. 327.

■ The common-law definition of larceny (according to East's Pleas of the Crown) is the "wrongful or fraudulent taking and carrying away, by any person, of the mere personal goods of another, from any place, with a felonious intent to convert them to his (the taker's) own use, and make them his own property, without the consent of the owner." In its essence it consists in the wrongful or fraudulent invasion by one of another's possession of personal property with intent to convert it to his own use, and in the taking and carrying it away. See Commonwealth v. Eichelberger, 119 Pa. 254, 13 A. 422, 4 Am.St.Rep. 642; Hildebrand v. People, 56 N.Y. 394, 15 Am.Rep. 435; Loomis v. People, 67 N.Y. 322, 23 Am.Rep. 123; Commonwealth v. Barry, 125 Mass. 390.

■ This is the meaning of the word "larceny" as generally understood in this country and the meaning of that word in the treaties. Kelly v. Griffin, 241 U.S. 6, 15, 36 S.Ct. 487, 60 L.Ed. 861; Factor v. Laubenheimer, 290 U.S. 276, 299–301, 54 S.Ct. 191, 78 L.Ed. 315.

■ If under sections 347 and 386 of the Criminal Code of Canada a crime containing the incidents or elements involved in larceny, as commonly known in this country, can be spelled out, the petitioner, if extradited, could be tried there for such offense, but he could not properly be tried for the offense charged in the complaint sworn out before the justice of the peace at Ottawa, which was nothing more than a charge of embezzlement, as to which no demand is here made on that ground. Nor should he be found guilty without proof of the elements of the crime of larceny as here generally understood, which, apparently, the provisions of the Canadian Criminal Code, above quoted, would as a rule permit.

But however this may be, we do not think that, on the evidence introduced in this case, the Commissioner was justified in finding reasonable ground to believe that the crime of larceny had been committed. There was no invasion of the government's possession, fraudulent or otherwise, with the intent to deprive Canada of its property. The money was paid to and received by Hatfield as his own. The evidence conclusively shows that, at the time Hatfield received the money at Ottawa, it was turned over to him voluntarily in payment of his claim, with the intent of the government to part with its title as well as possession and without any expectation of getting it back.

In State v. Watson, 41 N.H. 533, 537, the court said:

"The inquiry as to the owner's intention is, whether, in making the delivery, he intended to part with the property, or only with the possession of the thing delivered. If he parted with the property to the prisoner, by whatever fraudulent means he was induced to give the credit, it cannot be larceny. Where persons, led by fallacious appearances held out to them by a prisoner, or those with whom he was acting in concert, have given him credit for goods, which, without such fraud, he would never have obtained, and of which he previously intended to cheat the owners, and the property was intended to be transferred to the identical person to or for whom the delivery is made, this does in no case amount to larceny, because, however fraudulent the intent may be, there is no trespass in the taking, without which there can be no larceny or robbery. Where such credit is obtained by *false pretenses,* the legislature have supplied a particular remedy." (Italics supplied.)

Extradition should not be granted on this ground.

The petitioner sought to introduce in evidence through his witness Pugsley (called as an expert on the law of Canada), sections 1140 and 1141 of part 24 of the Revised Statutes of Canada, 1927, they being statutes of limitation upon proceedings in Canada. But the witness, on being interrogated as to whether these sections had any relation to the offenses alleged in the present complaint, answered: "Well, I will say frankly that I considered that question but do not feel to be in a position to express an opinion." And the evidence was excluded.

■ If it were open to us, in a habeas corpus proceeding, to pass on the question of an alleged error in the reception or rejection of evidence, which we understand it is not, the petitioner not having shown that the sections referred to had anything to do with the offenses charged, could not complain. Furthermore exemption from prosecution by lapse of time is a matter of defense to be taken up at the time and place of trial. If the Treaty of 1931 had been acceded to by Canada and was in force between the respective governments and there was evidence that exemption from prosecution had "been acquired by lapse of time, according to the laws of the High Contracting Party applying or applied to," under article 5 of that treaty it is probable that this court or the Secretary of State would be called upon to consider whether exemption from prosecution had arisen by lapse of time according to the laws of either country, and, if it had, to withhold extradition. See article 5 of the Treaty of December 22, 1931, 47 Stat. 2124.

The judgment or decree of the District Court discharging the writ, so far as it relates to the first count, is affirmed, but so far as it relates to the second count, it is vacated.