## CLEUGH v. STRAKOSCH.
### No. 9166.

Circuit Court of Appeals, Ninth Circuit.
Feb. 1, 1940.

Rehearing Denied April 9, 1940.

---

S. T. Hankey and F. J. Finucane, both of Los Angeles, Cal. (S. T. Hankey and G. Harold Janeway, both of Los Angeles, Cal., of counsel), for appellant.

Isidore B. Dockweiler, Frank P. Jenal, and Frederick C. Dockweiler, all of Los Angeles, Cal., for appellee.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

MATHEWS, Circuit Judge.

Extradition of appellee, Alexander Strakosch (alias Graham), was sought by Great Britain under the Dawes-Simon Extradition Treaty,[1] .47 Stat. 2122. To that end, a complaint and two amended complaints were filed[2] with a United States commissioner for the Southern District of California, charging appellee with having committed within the jurisdiction of Great

---

[1] Signed December 22, 1931; ratified by the United States March 3, 1932, by Great Britain July 29, 1932; proclaimed August 9, 1932.

[2] The original complaint was filed on October 14, 1937, the first amended complaint on November 16, 1937, the second amended complaint on December 7, 1937.

Britain—in London, England—the crime of fraudulent conversion and the crime of obtaining money or valuable securities by false pretenses. The commissioner issued his warrant for the apprehension of appellee, appellee was apprehended and brought before the commissioner, the commissioner heard evidence of appellee's criminality and thereupon committed him to jail,[3] to be surrendered, upon requisition, to the British authorities. Appellee, alleging that his detention was unlawful, petitioned the District Court for a writ of habeas corpus. The court issued the writ and, after a hearing, ordered appellee discharged. From that order, this appeal is prosecuted.

■ The original complaint was filed by an assistant United States Attorney for the Southern District of California. The amended complaints were filed by the then British consul, Francis E. Evans. The original complaint and both amended complaints were for and on behalf of the British government. The habeas corpus proceeding was brought against the United States marshal for the Southern District of California, but was defended by Consul Evans, by whom also this appeal was taken. The present consul, Eric Arthur Cleugh, was substituted as appellant on October 17, 1939. The British government being the real party in interest, its consul, acting for it, was a proper party to prosecute the extradition proceeding and to defend the habeas corpus proceeding, and is a proper party to prosecute this appeal. Ornelas v. Ruiz, 161 U.S. 502, 507, 16 S.Ct. 689, 40 L.Ed. 787.

Article 1 of the Dawes-Simon Extradition Treaty provides: "The High Contracting Parties [the United States and Great Britain] engage to deliver up to each other, under certain circumstances and conditions stated in the present Treaty, those persons who, being accused * * * of any of the crimes or offenses enumerated in Article 3, committed within the jurisdiction of the one Party, shall be found within the territory of the other Party." Article 3 enumerates, among others, the crime of fraudulent conversion and the crime of obtaining money or valuable securities by false pretenses. The second amended complaint charged appellee with having committed the crime of fraudulent conversion three times and the crime of obtaining money or valuable securities by false pretenses sixteen times. Thus appellee was charged with having committed, in all, nineteen crimes.

Article 8 of the treaty provides: "The extradition of fugitive criminals under the provisions of this Treaty shall be carried out in the United States and in the territory of His Britannic Majesty respectively, in conformity with the laws regulating extradition for the time being in force in the territory from which the surrender of the fugitive criminal is claimed." In the United States, extradition was at all pertinent times, and is now, regulated by § 5270 of the Revised Statutes, 18 U.S.C.A. § 651, which provides:

"Whenever there is a treaty * * * for extradition between the Government of the United States and any foreign government,[4] any * * * commissioner, authorized so to do by any of the courts of the United States[5] * * * may, upon complaint made under oath,[6] charging any person found within the limits of any State[7] * * * with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty[8] * * * issue his warrant for the apprehension of the person so charged, that he may be brought before such * * * commissioner, to the end that the evidence of criminality may be heard and considered. *If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty* * * * he shall certify the same * * * to the Secretary of State, that a warrant may issue * * * for the surrender of such person, according to the stipulations of the treaty * * * and he [the commissioner] shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made." (Italics ours.)

---

[3] December 13, 1937.

[4] There is and was at all pertinent times a treaty for extradition between the United States and Great Britain, namely, the Dawes-Simon Extradition Treaty.

[5] In this case, the commissioner was so authorized.

[6] In this case, the complaints (original and amended) were made under oath.

[7] Appellee was found within the limits of the State of California and within the Southern District thereof.

[8] The complaints charged appellee with having committed in London, England, crimes provided for by the treaty.

The extradition proceeding here in question was instituted and prosecuted under and in conformity with § 5270, supra. It is clear that the commissioner had jurisdiction, and that the crimes charged were extraditable crimes. Hence, the sole question before the commissioner was whether the evidence was "sufficient to sustain the charge under the provisions of the proper treaty"—in this case, the Dawes-Simon Extradition Treaty.

Article 9 of the treaty provides: "The extradition shall take place only if the evidence be found sufficient according to the laws of the High Contracting Party applied to * * * to justify the committal of the prisoner for trial, in case the crime or offence had been committed in the territory of such High Contracting Party * *." As regards sufficiency of the evidence, "the laws of the High Contracting Party applied to" are, in this case, the laws of California. Charlton v. Kelly, 229 U.S. 447, 456, 33 S.Ct. 945, 57 L.Ed. 1274, 46 L.R.A.,N.S., 397; Collins v. Loisel, 259 U.S. 309, 314–317, 42 S.Ct. 469, 66 L.Ed. 956; Curreri v. Vice, 9 Cir., 77 F.2d 130.

Section 871 of the Penal Code of California provides that a defendant brought before a magistrate for examination must be discharged if, "after hearing the proofs, it appears either that no public offense has been committed or that there is not sufficient cause to believe the defendant guilty of a public offense." Section 872 of said Code provides that the defendant must be held to answer if "it appears from the examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof." It is conceded that, in this case, it appeared that public offenses had been committed. The question was whether there was "sufficient cause" to believe appellee guilty thereof.

The phrase "sufficient cause," in §§ 871 and 872 of the Penal Code, means reasonable or probable cause. This appears from § 1487 of the same Code, which provides that where "a party has been committed on a criminal charge without reasonable or probable cause," he shall be released on habeas corpus. Thus, in California, to justify committal of an accused person for trial, the evidence need not be such as would support a conviction. Evidence showing reasonable or probable cause to believe the accused guilty is sufficient. Curreri v. Vice, supra; In re Mesquita, 139 Cal.App. 91, 33 P.2d 459; In re McCarty, 140 Cal.App. 473, 35 P.2d 568.

The commissioner found that there was sufficient cause—in other words, reasonable or probable cause—to believe appellee guilty of the crimes charged. Except to the limited extent presently to be indicated, the commissioner's finding was not reviewable on habeas corpus. For, as said by Justice Holmes in Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970: "That writ * * * cannot take the place of a writ of error. It is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate had jurisdiction, where the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." See, also, Benson v. McMahon, 127 U.S. 457, 461–463, 8 S.Ct. 1240, 32 L.Ed. 234; In re Oteiza y Cortes, 136 U.S. 330, 334, 10 S.Ct. 1031, 34 L.Ed. 464; Ornelas v. Ruiz, supra, 161 U.S. at pages 508, 509, 16 S.Ct. at page 689, 40 L.Ed. 787; Bryant v. United States, 167 U.S. 104, 105, 17 S.Ct. 744, 42 L.Ed. 94; Terlinden v. Ames, 184 U.S. 270, 278, 22 S.Ct. 484, 46 L.Ed. 534; Grin v. Shine, 187 U.S. 181, 192, 23 S.Ct. 98, 47 L.Ed. 130; Elias v. Ramirez, 215 U.S. 398, 406, 407, 30 S.Ct. 131, 54 L.Ed. 253; Charlton v. Kelly, supra; Bingham v. Bradley, 241 U.S. 511, 516, 517, 36 S.Ct. 634, 60 L.Ed. 1136.

In this case, appellee never claimed or contended that the commissioner lacked jurisdiction, or that the crimes charged were not within the treaty. Hence, the sole question was, and is, whether there was any evidence warranting the finding that there was reasonable or probable cause to believe appellee guilty—not whether such evidence was sufficient, but whether there was any such evidence. The sufficiency or insufficiency of such evidence was for the commissioner, not the court, to determine. See authorities last hereinabove cited.

Evidence before the commissioner included, inter alia, certified copies of thirty depositions taken by a British magistrate,

Sir Harry Twyford, in London, England.[9] The copies were authenticated in accordance with § 5271 of the Revised Statutes, 18 U.S.C.A. § 655,[10] and were received in evidence without objection. From the depositions, these facts appear:

The crimes for which appellee's extradition is sought were committed in London between February 5, 1935, and February 2, 1937. They were committed by Stanley Grove Spiro and persons associated with him. Spiro and his associates had offices in London, where, masquerading as investment brokers, they operated a bucket shop and sold bogus stocks and other worthless "securities". They called themselves by various names. At one office, they called themselves Maclean & Henderson. At another office, they called themselves S. R. Bunt & Company.[11] As Maclean & Henderson, they committed fourteen, and, as S. R. Bunt & Company, they committed five, of the nineteen crimes for which appellee's extradition is sought.

Victims of these crimes were Reginald Harry East, Peter Daniel, William Scott, William Fothergill, John Henry Turner, Frank Plater, John Cooper Russell, Charles Henry Row and Francis Jackson. As Maclean & Henderson, Spiro and his associates fraudulently converted two sums of money entrusted to them by East and property received by them from Daniel. Also, as Maclean & Henderson, they obtained by false pretenses money from Scott and securities from East, Daniel, Scott, Fothergill, Turner, Plater and Russell. Securities were thus obtained from Scott on two occasions and from Fothergill on three. As S. R. Bunt & Company, Spiro and his associates obtained securities by false pretenses from Row on two occasions and from Jackson on three.[12]

One of Spiro's associates was appellee.[13] Persons with whom Spiro had dealings were advised by Spiro in appellee's presence that appellee was Spiro's "assistant". This was confirmed by appellee's conduct. Appellee assisted in procuring for Spiro and his associates the offices in which they, as Maclean & Henderson and S. R. Bunt & Company, carried on their fraudulent operations. Appellee had charge of and managed those offices, employed and paid the office help, opened mail, dictated and signed letters, sent and received telephone messages, ordered and paid for printing, collected and deposited money for Maclean & Henderson and S. R. Bunt & Company, and was well aware of the fraudulent and criminal character of the "business" in which they, and he, were engaged.

Appellee contends that there was no evidence warranting a belief that he participated in any of the crimes here in question. The contention is rejected. There is evidence that some of the crimes were participated in by a person calling himself Richards, others by a person calling himself Mortimer, one by a person calling him-

---

[9] The depositions were in support of a warrant issued by the magistrate on September 13, 1937, for the apprehension of appellee and Stanley Grove Spiro.

[10] "In all cases where any depositions, warrants, or other papers or copies thereof shall be offered in evidence, upon the hearing of any extradition case * * * such depositions, warrants, and other papers, or the copies thereof, shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be · properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that any deposition, warrant or other paper or copies thereof, so offered, are authenticated in the manner required."

[11] Individual aliases also were used. Spiro called himself Royston. Appellee (whose true name is Strakosch) called himself Graham and, quite probably, used other aliases.

[12] Accompanying the British magistrate's warrant for the apprehension of appellee and Spiro is a so-called information—a statement of the facts shown by the depositions. The information is in eleven paragraphs, designated (a) to (h), inclusive, and (j) to (l), inclusive. Paragraphs (a), (b), (d), (e), (f) and (h) describe one crime each. Paragraphs (c) and (l) describe two crimes each. Paragraphs (g), (j) and (k) describe three crimes each. Thus the information describes, in all, nineteen crimes. In the second amended complaint filed with the commissioner, the same crimes are described in nineteen paragraphs. There is no conflict or discrepancy between the information and the second amended complaint.

[13] Other associates of Spiro were Samuel Taylor, William Underhill and John William Robert Elphinstone.

self Simpson, and one by a person calling himself J. Elphinstone.[14] "Richards" claimed to be the manager of Maclean & Henderson. "Simpson" and "J. Elphinstone" claimed to be agents of Maclean & Henderson. "Mortimer" claimed to be the agent of both Maclean & Henderson and S. R. Bunt & Company. Stenographers and typists working in the offices of Maclean & Henderson and S. R. Bunt & Company never knew anyone by the name of Richards, Mortimer, Simpson or J. Elphinstone. They did know and take orders from appellee, who was in fact the manager of both offices. It is possible and, we think, highly probable that the names "Richards," "Mortimer," "Simpson" and "J. Elphinstone" were mere aliases used by appellee.[15]

■ Moreover, from the facts stated in the depositions, it is reasonably inferable —and, we think, obvious—that Spiro and his associates, including appellee, were engaged in a conspiracy, and that the crimes in question were committed in furtherance thereof. It therefore makes no difference whether appellee was present or absent at the commission of the acts constituting the crimes, or whether he did or did not directly participate in their commission. 14 Am.Jur., Criminal Law, § 80, pp. 823, 824.

■ There was, we conclude, evidence warranting the commissioner's finding that there was reasonable and probable cause to believe appellee guilty of the crimes for which his extradition is sought.

■ Article 18 of the Dawes-Simon Extradition Treaty provides: "The present Treaty shall come into force ten days after its publication, in conformity with the forms prescribed by the laws of the High Contracting Parties." The treaty was published in the United States on August 9, 1932. It was published in Great Britain on June 14, 1935.[16] Thus the treaty came into force in the United States on, if not before, June 24, 1935.[17] This extradition proceeding was commenced on October 14, 1937. Hence, it was and is governed by the Dawes-Simon Extradition Treaty.

■ Since crimes committed before the effective date of the treaty are not by its terms excepted therefrom, the treaty applies to such crimes as well as to those subsequently committed. In re De Giacomo, 7 Fed.Cas. No. 3,747, page 366; In re Stupp, 23 Fed.Cas. No. 13,562, page 281, Id., No. 13,563, page 296. It is immaterial, therefore, that two of the nineteen crimes for which appellee's extradition is sought were committed before June 24, 1935.

Order reversed and case remanded, with directions to discharge the writ of habeas corpus and remand appellee to the custody of the marshal.

---

[14] The evidence shows that "J. Elphinstone" was not John William Robert Elphinstone.

[15] See footnote 11.

[16] Appellee's brief so states, citing as authority for the statement Hatfield v. Guay, 1 Cir., 87 F.2d 358, 360. As appellant (the British consul) has not challenged the statement, we accept it as correct.

[17] It is arguable that the treaty came into force in the United States on August 19, 1932—ten days after its publication in the United States. Hatfield v. Guay, supra, held that it did not come into force until June 24, 1935—ten days after its publication in Great Britain. The question was raised, but not decided, in Factor v. Laubenheimer, 290 U.S. 276, 301–304, 54 S.Ct. 191, 78 L.Ed. 315. We need not and do not decide it in this case.