Ely FREEDMAN

v.

UNITED STATES of America.

Civ. A. No. 77–904 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

July 18, 1977.

Jacob W. Heller, Robert G. Fierer, Benjamin Geizhals, Bruce H. Morris (H. Sol Clark, Savannah, Ga., Weiss Rosenthal Heller Schwartzman & Lazar, New York City, Fierer & Devine, Atlanta, Ga.), for petitioner.

Harvey D. Harkness and Gary G. Grindler (Powell, Goldstein, Frazer & Murphy, Atlanta, Ga.), for intervenor, Dominion of Canada, Province of Ontario.

## ORDER

RICHARD C. FREEMAN, District Judge.

On July 29, 1976, the Dominion of Canada, Province of Ontario [hereinafter "Canada"], filed the instant complaint in extradition seeking the return of petitioner Ely Freedman, a citizen of the United States and resident of Atlanta, Georgia, for the purpose of bringing him to trial in Canada

on five criminal charges allegedly arising in connection with the sale of securities in Buffalo Gas & Oil Company [hereinafter "Buffalo"]. *See* 18 U.S.C. § 3184. On November 30, 1976, the Crown determined that it would only seek extradition on two of the charges, the charge of bribery (payment of a secret commission) and of criminally defrauding Growth Equity Fund Limited [hereinafter the "Fund"]. Following a full hearing, on June 1, 1977, the United States Magistrate sitting by designation of this court, issued an order and warrant of commitment directing that the petitioner be committed to the Attorney General of the United States to await the issuance of a warrant by the Secretary of State authorizing his surrender to Canada. The warrant of commitment recited the magistrate's finding that there existed sufficient evidence of criminality to warrant petitioner's extradition on the pending charges pursuant to the Webster-Ashburton Treaty of 1842. Prior to the Secretary of State's taking any action pursuant to the warrant, petitioner filed the instant application for a writ of habeas corpus seeking review of the magistrate's order of commitment. This court, in its discretion granted petitioner's application to be continued on bond pending a ruling on the merits of the petition, subject to certain additional restrictions which this court imposed. *See, e. g., Wright v. Henkel*, 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903); *Jimenez v. Aristiguieta*, 314 F.2d 649 (5th Cir. 1963); *Shapiro v. Ferrandina*, 355 F.Supp. 563, 567 (S.D.N.Y.1973).

■ Jurisdiction of this action is grounded upon the federal habeas corpus statute, 28 U.S.C. § 2241, and numerous decisions holding that review of the order of extradition and commitment—while not available by direct appeal—is subject to limited review by means of habeas corpus. *E. g., Collins v. Miller*, 252 U.S. 364, 369, 40 S.Ct. 347, 64 L.Ed. 616 (1920); *Jimenez v. Aristeguieta, supra; Shapiro v. Ferrandina*, 478 F.2d 894 (2d Cir. 1973). Habeas corpus review of an order of extradition is restricted to three issues: (1) whether the committing magistrate had jurisdiction; (2) whether the offenses on which extradition has been sought are within the terms of the applicable treaty between the United States and Canada; and (3) whether there was any evidence to support the finding of the magistrate that there was reasonable ground to believe that an offense was committed and to believe that the accused was guilty of the offense charged. *E. g., Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925); *Garcia-Guillern v. United States*, 450 F.2d 1189, 1191 (5th Cir. 1971); cert. denied 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455; *Shapiro v. Ferrandina*, 355 F.Supp. 563, 567 (S.D.N.Y.1973) *modified* 478 F.2d 894 (2d Cir. 1973); *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973).

Petitioner challenges the magistrate's findings and order of commitment on numerous grounds: (1) that no criminal charges were pending against petitioner in Canada upon which extradition proceedings could be founded jurisdictionally; (2) that the extradition proceeding is barred by reason of the Canadian government's commitment not to extradite petitioner on the instant charges and petitioner's detrimental reliance on the Crown's commitment and promise; (3) that the Crown was guilty of inordinate delay in seeking extradition and that, therefore, the proceedings should have been dismissed for lack of a speedy prosecution; (4) that the proceedings should have been dismissed because of the acquittal of the four other individuals who were named as codefendants with petitioner in the 1974 criminal information; (5) that the crimes for which extradition has been sought were not extraditable since (a) not enumerated in the treaty and (b) because there are no comparable counterparts under Georgia law; (6) that the statute of limitations is an essential element of probable cause, and its expiration thereof bars the institution of extradition proceedings; and (7) that even assuming the truth of the Crown's allegations, probable cause for extradition was not sufficiently demonstrated. At this juncture, a brief review of the salient facts of the Crown's case and the procedural history of this action is warranted.

In 1970, petitioner Ely Freedman was a substantial stockholder in and the president of Guernsey Petroleum Corporation, a New

York corporation which owned certain oil and gas properties in the State of Ohio. Guernsey desired to secure additional capital to further develop its properties, and it was estimated that the drilling of additional contemplated wells would increase the revenues of the company approximately $200,000.00 per month. In April, 1970, in Atlanta, Freedman first met Leonard Varah, a Canadian, to discuss Guernsey's need for funds and to consider various methods of raising funds both here and in Europe. In the following months, Freedman and several of the other large shareholders in Guernsey travelled to Montreal to meet with Varah and his attorneys, including a Mr. Kravetz. In order to consummate the various fund-raising transactions Varah, Freedman and Rosen met with Varah's attorney who agreed to incorporate a new Quebec corporation, called Buffalo Gas & Oil Company. Thereafter, Guernsey exchanged all of its shares for those of Buffalo and became a wholly owned subsidiary of Buffalo. The corporation was formed on July 14, 1970, and during the period between June, 1970 and September 18, 1970, the attorney undertook to draft a prospectus for the sale of Buffalo shares. At the same time Varah sought to get commitments for purchase of the shares of Buffalo until such time as the prospectus could be published and final approval for the offering could be secured from the Quebec Securities Commission. While it initially appeared that European commitments had been obtained for most of the issue, by the time listing on the securities exchange had been secured most of the European interest in the offering had evaporated.

Thereafter, in Montreal, in June 1970, one Edwin Lynch of the brokerage firm of Malone, Lynch was approached by the principals of Buffalo to discuss whether his brokerage firm might sponsor an offering in Canada or at least agree to maintain the orderly aftermarket for distribution of the stock subsequent to the completion of the primary offering, distribution, and sale. Malone, Lynch agreed to perform the latter function, and in connection therewith an account was set up at Malone, Lynch in which cash and securities of Buffalo could be deposited. Thereafter, the principals of Buffalo purchased an existing "shell" company named Affiliated Purchasing, and 160,000 treasury shares of Buffalo were issued to Affiliated and deposited in its new account at the brokerage firm.

In January, 1971, a meeting was held which was attended by Freedman, Lynch, Varah and Malone at the Toronto office of Malone, Lynch securities. The brokerage firm was requested to include information about Buffalo in its monthly newsletter to its customers and further asked that a "buy" recommendation be issued to the firm's customers. On the following day Messrs. Malone, Lynch, Freedman and Varah again met. At that time Malone stated that he thought he could arrange a large sale of Buffalo stock to an institutional investor with the aid of a friend named Donald (Danny) King. On the next day, Malone reported that he could probably place 100,000 shares of the stock but that the transaction would have to be fifty cents below the last trade. Around cocktail hour that evening, Freedman, King, Lynch, Malone, and Varah met at a hotel in Toronto to discuss further the sale of the large block of shares to an institutional investor and King informed those present that he thought he could handle it.

According to the affidavit of Varah, submitted by the Crown in support of its prima facie case and showing of probable cause, Freedman told Varah that he would have to pay an amount of stock equal to 10% of the trade to Danny King for his services. Varah further stated that about a week later he observed that a large trade in Buffalo Gas and Oil had been reported on a Canadian stock exchange.

During the time period in question, one William Farquaharson was the Vice President of Growth Equity Fund. His obligations in connection with that position included the managing of the Fund's portfolio and he, therefore, had authority to purchase and sell securities for the Fund's portfolio. Near the end of 1970 or the beginning of 1971, Donald King, of Grant Johnson, Ltd. a stockbroker, who was also an agent of the Fund first brought Buffalo stock to the attention of Farquaharson and recom-

mended its purchase. On January 28, 1971, Farquaharson instructed King to purchase 35,000 shares for a price of $231,635.00; the trade was accomplished, and the Fund paid King a brokerage commission of $4,135.60. In April and December, 1971, the Fund liquidated its shares in Buffalo, at a loss to the Fund of $168,183.70. Farquaharson was not informed at the time of the purchase that King had been paid any additional or extraordinary commission in connection with the Fund's purchase of shares from the Affiliated account. In his affidavit, Mr. Farquaharson further stated that he would not have purchased the shares on behalf of the Fund had he known that the secret commission had been paid. The Crown presented further evidence showing that the 3500 shares of Buffalo transferred to King were subsequently deposited in King's account at Toronto Dominion Bank and were subsequently utilized by King as collateral for a loan in the amount of $21,000.00 made to him by the Bank on February 3, 1971.

The secret commission was apparently first discovered by the Commercial Crime Branch of the Royal Canadian Mounted Police (RCMP) in an investigation of possible irregularities in the trading of Buffalo shares on the Montreal Stock Exchange beginning in early 1973. On March 1, 1974, an information was sworn out by an officer of the RCMP, Sergeant McIllvenna naming Freedman and four others as confederates in the crimes.

### JURISDICTION

Petitioner contends that the committing magistrate lacked jurisdiction over him be-

cause there were no charges pending against him in Canada at the time the extradition proceedings were commenced. This purported lack of any pending Canadian criminal charges is predicated upon the following facts: (1) that petitioner was charged along with four other parties in the information sworn March 1, 1974; (2) that on March 5, 1974, the four Canadian codefendants were arraigned in Provincial Court in the Judicial District of York; (3) that at the time of the arraignment, Mr. Cartwright, the Crown prosecutor, made certain representations in court that extradition would not be sought as to Freedman;[1] (4) that an indictment subsequently came down charging the four confederates but not naming Freedman, although a warrant for petitioner's arrest, nevertheless, was issued on May 16, 1974; and (5) that Canada showed no inclination to extradite petitioner until 1976.

On the basis of the foregoing facts and the testimony of Brian H. Greenspan, Esq., a barrister, and a qualified expert in Canadian law, petitioner argues that under Canadian law of practice and procedure, the information is preliminary to and merges into the indictment based on the outstanding charges. Mr. Greenspan concludes that by reason of the failure to include petitioner as a defendant in the indictment, there are no outstanding charges pending against petitioner in Canada since the independent existence of the information disappeared through the merger of the information and the supervening indictment. *See Doyle v. The Queen*, 35 C.R.N.S. 1 (1976); *Regina v. Poitras, et al.* (Q.B. Nov. 24, 1976).[2] Moreover, petitioner further contends that in reliance upon the representations of the

1. At the arraignment hearing held on March 5, 1974, the Crown prosecutor, Mr. Cartwright remarked:

   I'd like to ask in this matter, Your Honor, first of all there has been no process issued against Mr. Freedman who is the third accused in count one. It appears throughout the information he is a resident of Atlanta, Georgia. We don't intend to extradite or ask for a process issued to have him come to this Court.

2. In *Doyle v. The Queen, supra,* the Canadian Supreme Court held that the powers exercised by a magistrate in Canada are circumscribed

by the provisions of the Criminal Code and must be conferred expressly or by necessary implication. In *Regina v. Poitras, et al.,* a judge in the Queen's Bench Division in the Supreme Court of Manitoba quashed an order of a provincial court judge who had ordered a severance of the accused at a preliminary hearing. Taken together, petitioner contends that the two decisions require this court to hold that since the provincial judge was without authority to order severance of the accused in the information, the charges against Freedman disappeared when the indictment was laid against the other four defendants.

Crown prosecutor that extradition would not be sought as to him, petitioner waived his attorney-client privilege with respect to Kravetz, who counselled both Varah and him. Mr. Kravetz testified at the trial of the Canadian defendants and the testimony was allegedly damaging with respect to Freedman's participation in the scheme and prejudices petitioner's ability to defend the charges should extradition be granted. Therefore, petitioner concludes that the lack of the pendency of any criminal charge vitiates the jurisdictional predicate for the instant extradition proceedings.

Relying upon 18 U.S.C. § 3190,[3] the Magistrate refused to accept petitioner's legal theory, concluding that "a diplomatic officer of the United States has certified that the warrant contained in the paper still exists, and this is admissible evidence, binding upon this Court to prove the existence of the charge."

■ Despite the petitioner's rather novel, but cogent arguments, we are compelled to agree with the magistrate's conclusion in this respect. In *Garcia-Guillern v. United States*, 450 F.2d 1189 (5th Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455, this circuit in dicta, suggested that "[a] contention that [the person whose extradition is sought] has never been properly or legally charged with a crime in accordance with the treaty is not appropriate for consideration" in habeas corpus proceedings brought to review the order of commitment. *Id.* at 1193, n. 1. Alternatively, the court of appeals noted that there was no factual merit in the contention raised in *Garcia-Guillern*, even if such a claim were cognizable, since there was testimony at the hearing to the effect that appellant had been charged with a crime,

that a provisional arrest warrant had been issued requiring the appearance of Garcia-Guillern before a Peruvian court, and that the Supreme Court of Peru had declared the petitioner's extradition lawful. Similarly, in the instant case the extradition record before the magistrate contained the information filed against petitioner the warrant for his arrest, and the certificate of the Deputy Minister of Justice for Canada. Under the foregoing decision, even assuming arguendo that petitioner's claim is cognizable, we are compelled to conclude that there was sufficient evidence to decide there were outstanding charges pending against petitioner upon which the jurisdiction of the magistrate was properly founded.

■ Similarly, petitioner's contention that the prosecution lapsed by reason of certain representations made by the Crown prosecutor that extradition of Freedman would not be sought, and any prejudice that petitioner suffered by reason of his reliance on such remarks, does not form an adequate basis to deny extradition. In the first instance, such a unilateral representation does not—without more—form the basis for a finding of a concrete agreement which was unfulfilled by the extraditing sovereign, such as might form the basis for relief from extradition on account of a breached plea bargain. *Compare Geisser v. United States*, 513 F.2d 862 (5th Cir. 1975), *on remand Petition of Geisser*, 414 F.Supp. 49 (S.D.Fla.1976), *vacated on other grounds Geisser v. United States*, 554 F.2d 698 (5th Cir. 1977). However, such representations and Canada's delay in seeking extradition presumably would be relevant to any discretionary decision not to extradite.[4]

**3.** 18 U.S.C. § 3190, governs the scope of evidence which may be introduced in connection with extradition proceedings and provides:

Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party

shall have escaped, and the certificate of the principal diplomatic or consular officers of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

**4.** *Petition of Geisser, supra,* recognizes that a breached plea bargain may in some instances form the basis for an order enjoining extradition in reliance on *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

## STATUTE OF LIMITATIONS

Petitioner has argued alternatively, that the failure of the Canadian government to seek extradition within the applicable five-year statute of limitations for non-capital offenses, *see* 18 U.S.C. § 3282, likewise supports a conclusion that there is no outstanding charge upon which extradition may be predicated. It is, arguably, also germane to the question of the extraditability of the offenses charged and will be considered *infra* at pages 1259 through 1263.

## EXTRADITABILITY OF THE OFFENSES CHARGED ·

On the basis of the facts set forth above, Canada has sought extradition of petitioner on the crimes of giving a secret commission or bribe to influence the sale of a large block of shares and of defrauding the Fund. The magistrate found that both offenses were extraditable under the applicable treaty, but had some difficulty in isolating functional local counterparts for the secret bribe charge.

In connection with the secret bribe charge, the magistrate ultimately concluded that the Canadian offense was the functional analog of modern day "commercial bribery" statutes, that the offense was likewise comparable to portions of the federal Travel Act, 18 U.S.C. § 1952,[5] and had logical counterparts in Georgia statutes making criminal certain conduct of third parties designed "to seduce or entice" a servant from the employment of his master. *E. g.*, Ga.Code Ann. §§ 66–9904; 66–9906.

It is, of course, well settled that the committing magistrate has the obligation to separate the extraditable from non-extraditable offenses in determining whether extradition should be granted. *Shapiro v. Ferrandina, supra*, 478 F.2d at 906–07. That threshold determination is necessary because under the "principle of specialty" long recognized in international law "the requisitioning state may not, without the permission of the asylum state, try and punish and fugitive for any of the crimes for which extradition was not granted."

Friedmann, Lissitzyn & Pugh, *International Law*, 493 (1969); *Shapiro v. Ferrandina, supra*, 478 F.2d at 905. *Accord, United States v. Archbold-Newball*, 554 F.2d 665, p. 685 at n. 21 (5th Cir. 1977). *See generally*, 1 Moore, *Extradition* 194–259 (1891). Therefore, international law recognizes that the asylum state may limit the trial of the fugitive in the demanding state to those crimes which have been found to be extraditable offenses in law and where probable cause to believe the petitioner committed the crime has been shown by the evidence. *Shapiro, supra*, 478 F.2d at 894.

Extradition is governed, in the first instance, by the Webster-Ashburton Treaty of 1842, *as amended*, 8 Stat. 576, between the United States and Canada. Article X of the treaty *sub judice* specifically sets forth the *sine qua non* of extraditability, that is, the requirement of double criminality, stating: .

"  .  .  provided that [extradition] shall only be done upon *such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, will justify his apprehension and commitment* for trial, if the crime or offence had there been committed  .  .  ." (emphasis supplied).

Therefore, the act or offense upon which extradition is demanded must be considered a crime by both parties to the treaty. *E. g., Wright v. Henkel*, 190 U.S. 40, 58, 23 S.Ct. 781, 47 L.Ed. 948 (1903); *Collins v. Loisel*, 259 U.S. 309, 312, 42 S.Ct. 469, 66 L.Ed. 956 (1922). Moreover, the "laws of the place where the person sought shall be found" generally "refers to the laws of the state where the arrest occurs rather than the laws of the United States." *Shapiro, supra*, 478 F.2d at 901; *Pettit v. Walshe*, 194 U.S. 205, 217, 24 S.Ct. 657, 48 L.Ed. 938 (1904); *see also Wright v. Henkel, supra*, 190 U.S. at 58–63, 23 S.Ct. 781. However, while the asylum state's substantive law should provide the initial guidance in the question of extraditability of a given offense, a number of courts, as well as the magistrate herein,

---

5. The Travel Act, 18 U.S.C. § 1952 proscribes interstate travel to promote any "unlawful activity" including "bribery  .  .  .  in violation of the laws of the State in which committed."

have recognized a caveat to the general rule, i. e., that unique or extraordinary provisions of the forum state's laws should not be applied where such interpretation would unduly impair effectuation of the intent of the parties to the treaty. *In re Shapiro,* 352 F.Supp. 641, 647 (S.D.N.Y.1973), *modified* 478 F.2d 894 (2d Cir. 1973). *See also Factor v. Lauberheimer,* 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933). *Cf. Jhirad v. Ferrandina,* 355 F.Supp. 1155, 1161 (S.D.N.Y.1973), *rev'd on other grounds* 486 F.2d 442 (2d Cir. 1974) (federal rather than state statute of limitations to be applied in construction of treaty's limitation provision). *Cf. United States ex rel. Bloomfield v. Gengler,* 507 F.2d 925, 927 n. 1 (2d Cir. 1974) (reference to federal law may be made in interpreting treaty language where interstate or foreign commerce is involved). Thus, it has been concluded by some courts that the act or offense to be extraditable must be criminal at common law, by an Act of Congress, or by a preponderance of the states. *See Wright v. Henkel, supra,* 190 U.S. at 57, 23 S.Ct. 781. *See also Shapiro v. Ferrandina, supra,* 355 F.Supp. at 570 n. 1; *Garcia-Guillern v. United States, supra,* 450 F.2d at 1192; *Wacker v. Beeson,* 256 F.Supp. 542, 544 (E.D.La.1966).

We turn first to the question of whether the crime of giving a secret bribe or commission is made criminal by the laws of the State of Georgia and whether it is a treaty offense.

Article X of the Webster-Ashburton Treaty of 1842, *as amended,* enumerates certain offenses upon which extradition may be sought. Paragraph 14 of the Conventions of 1905 added the following offense to those previously enumerated:

Bribery, defined to be the offering, giving, or receiving of bribes *made criminal by the laws of both countries.* (emphasis supplied).

Section 383 of the Canadian Criminal Code defines the crime of giving a secret commission, in relevant part, as follows:

§ 383. (1) Every one commits an offense who

(a) corruptly

(i) gives, offers or agrees to give or offer to an agent, . . . a reward, advantage or benefit of any kind as consideration for doing or forbearing to do, or for having done or forborne to do, any act relating to the affairs or business of his principal or for showing or for forbearing to show favor or disfavor to any person with relation to the affairs or business of his principal . . .

(2) Every one commits an offense who is knowingly privy to the commission of an offense under subsection (1).

The common law concept of "bribery has traditionally focused upon corrupt activities by public officials." *United States v. Nardello,* 393 U.S. 286, 293 n. 11, 89 S.Ct. 534, 538, 21 L.Ed.2d 487 (1969). The traditional common law definition was limited to the "giving or receiving of anything of value in corrupt payment for an *official* act." *Bishop on Criminal Law* § 85(1) at 62 (9 ed. 1923). On the other hand, the term "commercial bribery" has been developed by statute, and the offense is committed by the offering and/or paying of a bribe to an employee, agent, or servant, with the intent that his relation to his employer, principal, or master be influenced thereby. *See* 1 A.L.R.3d 1350, 1359 (1965). As of 1960, one half of the states, including Georgia, imposed no criminal sanctions upon "commercial bribery", as such; twelve had limited statutes, and only thirteen states had general statutes punishing commercial bribery as an offense. Note, *Control of Nongovernmental Corruption by Criminal Legislation,* 108 Pa.L.Rev. 848, 864, 866 (1960) (chart). Similarly, under the laws of the United States bribery that is made criminal is typically restricted to payments made to public officials or officers of the court. *See, e. g.,* 18 U.S.C. § 201, *et seq.*

Canada argues and the magistrate agreed, however, that "commercial bribery" must be considered in its generic sense as a payment to induce or influence the breach of a public or private trust, and relies principally upon the opinion of the Fourth Cir-

cuit in *United States v. Pomponio,* 511 F.2d 953, 956 (4th Cir. 1975), in which the court observed:

> . . . While the states and the federal government have enacted statutes dealing with the corruption of public officials, they have also extended the concept of bribery into areas of private conduct which we think appropriately fall within the ambit of the Travel Act. [18 U.S.C. § 1952].

At least two courts, however, have reached a contrary result, holding that "commercial bribery" is not the type of "bribery" to be punishable under the Travel Act. These decisions note particularly that even in states where commercial bribery statutes have been enacted, the offense is uniformly classified as a misdemeanor with punishments varying between three months and a year, whereas the bribery of a public official is generally classified as a felony with punishments exceeding five years imprisonment. *See generally, United States v. Brecht,* 540 F.2d 45 (2d Cir. 1976); *United States v. Niedelman,* 356 F.Supp. 979 (S.D.N.Y.1973). It is unclear whether the magistrate concluded that the Travel Act made criminal the same conduct prohibited by § 383 of the Canadian Criminal Code, or whether the *Pomponio* decision was relied upon purely for the recognition of a general principle that commercial bribery is generally recognized as conduct prohibited by the criminal laws of Georgia, the United States, or the multitude of the individual states. In either event, we are constrained to reject such conclusions. In the first instance, the Travel Act itself contains essential elements including interstate travel which is integral to the offense. Similarly, the Travel Act carries with it connotations of prohibiting racketeering related offenses not at the heart of Canada's commercial bribery statutes.

Furthermore, our threshold finding of extraditability must be based upon comparability to the criminal laws of the asylum state, Georgia. In this respect, Georgia has no express statute governing "commercial bribery" of the species or character comparable to that made an offense under § 383 of the Canadian Criminal Code. *Compare* N.Y. Penal Law § 180.05.[6] While it is unnecessary that the nomenclature used to describe the crime in the asylum and demanding states be identical, *cf. United States v. Brecht, supra,* or that the scope of liability be coextensive, both jurisdictions must consider and make the conduct charged criminal. *Collins v. Loisel, supra,* 259 U.S. at 312, 42 S.Ct. 469, *see also Bryant v. United States,* 167 U.S. 104, 108, 17 S.Ct. 744, 42 L.Ed. 94 (1897). Although one-half of the states in this country have by statute recognized the crime of commercial bribery, it is equally clear that Georgia cannot be described as an aberration, for the reason that an equal number of states have failed to define such conduct as criminal. Therefore, we find no close counterpart for the crime of commercial bribery under Georgia law.

The magistrate further concluded that while not express, certain Georgia provisions have been enacted imposing penal sanctions for violations of and interference with employer-employee relationships. *E. g.,* Ga.Code Ann. §§ 66–9907,[7] 9906.[8] Nei-

---

6. New York has a "commercial bribery" statute which is quite similar to § 383 of the Canadian Criminal Code. The crime of commercial bribe receiving is defined as:

> An employee, agent, or fiduciary is guilty of commercial bribe receiving when, without the consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs.

N.Y. Penal Law § 180.05.

7. Ga.Code Ann. § 66–9904. *Employing servant, cropper, or farm laborer of another.* When the servant, cropper, or farm laborer of another shall be under written contract attested by one or more witnesses, any person who shall employ such servant, cropper, or farm laborer during the term for which he is employed, knowing that he is so employed, and that the term of service has not expired, shall be guilty of a misdemeanor.

8. Ga.Code Ann. § 66–9906. *Unlawfully preventing laborers, etc. from performing duties.* Any person or persons, who, by threats, violence, intimidation, or other unlawful means, shall prevent or attempt to prevent any person or persons from engaging in, remaining in, or performing the business, labor, or duties of any lawful employment or occupation, shall be guilty of a misdemeanor.

ther of these provisions, however, appears to be directed at the same evil as that at which the Canadian commercial bribery statute is aimed. In the first instance, Ga. Code Ann. § 66–9904 applies exclusively to servants, croppers, or farm laborers under written contract for more than a year and thus is severely restricted to several finite classes of employees, *see Wometco Theatres, Inc. v. United Artists Corp.,* 53 Ga. App. 509, 513, 186 S.E. 572 (1963), § 66–9904; therefore, it cannot be construed to be a statute making all interference with an employer-employee relationship criminal. Similarly, Ga.Code Ann. § 66–9906 which prohibits the use of "threats, violence, intimidation, or other unlawful means" to interfere with the employer-employee relationship appears to have been directed primarily at remedying illegal strikes and other violent labor practices which were designed to induce or coerce non-union employees to join unions and violate their employees freedom of choice not to join a union and their employer's concomitant right to operate their business on a non-union basis. Accordingly, § 66–9906 does not appear to be directed at the "evil" of any breach of fiduciary trust that might be engendered by the offering of a bribe. *See, Robinson v. Bryant,* 181 Ga. 722, 729, 184 S.E. 298, 301 (1935). In sum, we conclude that neither the laws of this state, nor the United States, nor a healthy majority of the states in this country recognize the commercial bribery contemplated by § 383 of the Canadian Criminal Code, with the result that such conduct is not criminal "according to the laws of the place where the . . . person so charged shall be found" within the meaning of Article X of the instant treaty. Therefore, extradition on the charge of the giving of a secret bribe is precluded by the lack of comparability.

■ Petitioner is further charged as having, along with King and the other three defendants, defrauded Growth Equity Fund Limited of valuable property, § 231,-635.60, in connection with the sale of 35,000 shares of Buffalo to the Fund. The Webster-Ashburton Treaty specifically enumerates as an extraditable offense "[f]raud by bailee, banker, agent . . . made crim-

inal by the laws of both countries" as well as "obtaining money, or valuable securities by false pretenses or by defrauding the public or any person by deceit or falsehood or other fraudulent means whether such deceit or falsehood, or any fraudulent means would or would not amount to a false pretense." Insofar as the substantive offense has been alleged, we agree with the magistrate's conclusion that the fraud charge has analogous counterparts under Georgia law, including "theft by deception," Ga.Code Ann. § 26–1803, and the state blue sky law, which makes it unlawful to employ a scheme, device or artifice in connection with the sale of securities. Ga.Code Ann. § 97–112. Similar analogies may be drawn from federal securities laws which prohibit as unlawful the making of untrue statements or the omission of material facts in connection with the purchase or sale of a security, *e. g.,* 15 U.S.C. § 78j, and the criminal provisions contained in §§ 24 and 32 of the 1933 and 1934 federal securities laws respectively.

However, since it is not alleged that Freedman was the actual perpetrator of the crime in the sense that he failed to disclose the existence of the secret commission to the representative of the Fund, petitioner has argued that liability, if any, must derive from a conspiracy to defraud, and that the treaty in question does not include conspiracy as an extraditable offense. Freedman's liability on the charge of defrauding Growth Equity has been predicated upon § 21(2) of the Criminal Code of Canada, which provides:

Where two or more persons form an intention in common to carry out an unlawful purpose and to assist each other therein and any one of them, in carrying out the common purpose, commits an offense, each of them who knew or ought to have known that the commission of the offense would be a probable consequence of carrying out the common purpose, is a party to that offense.

Petitioner contends that the gravamen of the foregoing theory of liability is a conspiracy, which is a crime not extraditable under the Webster-Ashburton Treaty at the relevant times in question. The magistrate

concluded, however, that the Canadian statute does not involve a conspiracy because of the purported absence of the *sine qua non* of a conspiracy, the agreement. Moreover, the magistrate further concluded that the Canadian statute further requires that an offense be committed whereas under conspiracy laws the presence of the agreement plus any overt act taken in furtherance thereof will be sufficient to impose criminal liability. *E. g.,* 18 U.S.C. § 371; Ga.Code Ann. § 26–3202. The Canadian provision does not require an express agreement although it does contemplate the common intention of the parties to commit an unlawful purpose. However, since the Canadian statute contemplates the commission of a substantive offense by at least one of the parties, it is, therefore, similar to and comparable to "party" liability such as that established in Ga.Code Ann. § 26–801.[9] In sum, petitioner is extraditable on the charge of being a party to the commission of the crime of defrauding Growth Equity Fund.

## STATUTE OF LIMITATIONS

█ Assuming then that the offense of criminal fraud is extraditable in the abstract, we turn to petitioner's remaining defenses, including those based on the statute of limitations. As a general proposition it is well established that in the absence of a treaty provision, a statute of limitations may not be raised as a defense to the extradition proceedings. *E. g., Merino v. United States Marshal,* 326 F.2d 5 (9th Cir. 1963) *cert. denied* 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046; *Hatfield v. Guay,* 87 F.2d 358, 364 (1st Cir. 1937). *See First National Bank of New York v. Aristeguieta,* 287 F.2d 219, 227 (2d Cir. 1960) (citing the general proposition without, however, applying the rule). Petitioner has not raised the five-year statute of limitations provided by 18

U.S.C. § 3282, in the traditional sense that such term was used in the foregoing decisions announcing the general rule. On the contrary, petitioner contends that "the statute of limitations is applicable as an element of the crime which must be considered in determining probable cause under the terms of the treaty," even in the absence of any specific treaty provision compelling reference to the statute of limitations of either the asylum or the demanding state.

While the argument *sub judice* has been raised on several prior occasions, *e. g., Vaccaro v. Collier,* 38 F.2d 862 (D.Md.1930) *modified on other grounds,* 51 F.2d 17 (4th Cir. 1931); *Asselin v. Jenkins* (Commissioner's Docket 1, Case No. G–12) (N.D.Cal. 1966) [Dept. of State File PS 10–4 CAN–US]; *In the Matter of the Extradition of Daniel William O'Connor,* No. 4825 (W.D. Wash.1959), it has only been authoritatively ruled upon in one decision. *Asselin v. Jenkins, supra.* Moreover, one of the leading authorities on Canadian extradition law has observed that:

> Whether in the absence of express provisions [in a treaty] extradition will be granted where exemption has been obtained by the lapse of time according to the laws of the requested country has not been decided.

La Forest, *Extradition To and From Canada* 4 (1967).

The cases cited for the general proposition that absent a specific treaty provision, the statute of limitations may only be raised as a defense to criminal proceedings after return to the demanding country have all arisen in connection with challenges to extradition based upon the statute of limitations of the demanding state. *E. g., Merino v. United States Marshal, supra; Hatfield v. Guay, supra.* Thus, even where there is an express treaty provision, the

---

**9.** Ga.Code Ann. § 26–801. *Parties to crime; punishment,* provides:

(a) Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime.

(b) A person is concerned in the commission of a crime only if he: (1) directly commits the crime; or (2) intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity; or (3) intentionally aids or abets in the commission of the crime; or (4) intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

person whose extradition is sought presumably has an ample opportunity to raise the limitation as a defense to the criminal proceedings. On the other hand, the question of whether the prosecution is time-barred according to the laws of the asylum state, is a consideration unique to the committing magistrate and is not subject to review upon return to the demanding state. *Jhirad v. Ferrandina*, 536 F.2d 478, 485 (2d Cir. 1976).

■ Article X of the Webster-Ashburton Treaty of 1842 requires that extradition may only be granted as to offenses as to which there is "such evidence of criminality, as according to the law of the place where the fugitive or persons so charged shall be found, would justify his apprehension and commitment for trial, if the crime had there been committed." Thus, petitioner argues that a full application of the law of the place where Freedman is found, including the statute of limitations, would not justify his apprehension and commitment for trial if the crimes had been committed in Georgia or in the United States. The treaty under consideration between the United States and Canada contains no reference to the question of the statute of limitations. *Compare Jhirad v. Ferrandina, supra.* There are a handful of decisions in this circuit which without adequate explanation consider whether the statute of limitations had run despite the lack of a treaty provision, *Neal v. United States Marshal at Southern District of Georgia*, 476 F.2d 602 (5th Cir. 1973), and at least one other court has indicated that if the statute of limitations of the asylum country (or state) had expired, extradition would have been barred. *Vaccaro v. Collier, supra.* If there is a treaty provision requiring reference to the laws of the asylum state, however, it is clear that the federal rather than state statute of limitations will be applied. *Garcia-Guillern v. United States, supra*, 450 F.2d at 1192 n. 1.

■ Despite dicta or other loose and imprecise language in some of these decisions, we find no rationale which would compel treatment of the statute of limitations either as an element of the crime or as a defense to extradition in the absence of a treaty provision. Since *Garcia-Guillern v. United States, supra*, indicates that where questions of the statute of limitations become involved, federal rather than state law will control, we are not inclined to apply decisions cited by the petitioner for the proposition that the statute of limitations is an element of the crime under Georgia law. In this connection, we have further been unable to locate any decision construing Rule 5.1, Fed.R.Crim.P., governing the analogous preliminary examination under federal criminal law and the probable cause determination, in which the question of the failure to prove probable cause as to the fact that the crime was committed within the applicable limitations period precluded binding the accused over for trial. Indeed, we have found no case indicating that the passage of the statute of limitations was a consideration for the magistrate of the preliminary hearing.

Accordingly, we conclude that since the Webster-Ashburton Treaty contains no express provision making extradition dependent upon a finding of probable cause that the offense committed was within the applicable limitations period under federal law, we are not inclined to modify the express agreement between two sovereign nations by judicial fiat. Again, the delay in seeking extradition may be relevant to the Secretary of State in making his final determination as to whether extradition may go forward.

■ In connection with the not insubstantial lapse of time between the alleged commission of the offenses charged and the date on which these proceedings were commenced, petitioner has further argued that the proceedings should be dismissed because of the denial of the right to a speedy prosecution and trial guaranteed by the Fifth and Sixth Amendments to the United States Constitution. *See United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). It is well established that the fact that a foreign judicial system does not provide identical criminal safeguards as those enjoyed in this country is not controlling on the question of extradition. *E. g., Neely v. Henkel*, 180 U.S. 109, 122, 21 S.Ct. 302, 45 L.Ed. 448 (1901); 360

F.Supp. 270, 274 (E.D.N.Y.1973); *Holmes v. Laird,* 148 U.S.App.D.C. 187, 459 F.2d 1211 (1972). Thus, the Sixth Amendment's guarantee of a speedy trial is not an appropriate consideration in the instant extradition proceedings. *Cf. United States ex rel. Bloomfield v. Gengler,* 507 F.2d 925, 928 (2d Cir. 1974) (that proceedings would have been barred by double jeopardy clause if initiated in this country not a bar to extradition).

## PROBABLE CAUSE

The remainder of petitioner's arguments are addressed to the sufficiency of the evidence to warrant the magistrate's finding of probable cause. It is well established that the appropriate standard to review the magistrate's finding is "whether the evidence showed a reasonable ground to believe the accused guilty." *Garcia-Guillern v. United States, supra.* Petitioner has argued by analogy to the test fashioned by the Supreme Court in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), a magistrate in making a determination as to whether a search warrant should issue on the basis of an affidavit should involve himself in a determination as to the reliability of the affidavits presented and not merely blindly believe such statements without regard to the underlying facts upon which the officer believed that the information was reliable. We agree with petitioner's theory that the magistrate need not wholly ignore the credibility and reliability of the complaining witness or affiant, *see Jaben v. United States,* 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965) *rehearing denied,* 382 U.S. 873, 86 S.Ct. 19, 15 L.Ed.2d 114, however, we find that the magistrate did not depart from such rule in his finding of probable cause.

In turning to review the finding of probable cause, we are mindful of the "well-entrenched rule that extradition proceedings are not to be converted into a dress rehearsal trial." *Jhirad v. Ferrandina, supra,* 536 F.2d at 484; *Charlton v. Kelly,* 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913).

The Crown's case consisted of certain documentary evidence, admissible in accordance with 18 U.S.C. § 3190, as well as the live testimony of Corporal Kossatz of the RCMP. At the close of petitioner's case, the magistrate rejected the Varah affidavit on grounds of unreliability, and observed that the sole remaining basis for probable cause was Sergeant McIlvenna's affidavit as to his investigation and discussions with Edwin Lynch. The magistrate, therefore, called Corporal Ross Oake as the Court's witness in an attempt to bolster the Crown's case through corroboration, particularly with respect to the Lynch discussion and the statements made by Lynch which incriminated Freedman. On cross-examination, it was learned that a tape recording had been made of the interview and a portion of the tape was produced which contained approximately thirty minutes out of a three and one-half hour interview. Petitioner moved to dismiss the proceeding or for production of the original tape for purposes of scientific investigation.

Petitioner contends that the transcript of the tape did not corroborate Corporal Oake's recollection of the conversation, that the transcript was exculpatory of Freedman, and that this court must presume the original tape was intentionally destroyed or was being deliberately concealed. This court has reviewed and examined the transcript of the portion of the tape produced. While the transcription is indeed sketchy, and numerous passages and words were evidently inaudible, the tape does include certain of Lynch's remarks incriminating petitioner,[10] therefore, petition-

---

**10.** In the course of the interview between the RCMP and Lynch, the following colloquy took place:

> Q: Anything you did here it appears here you did for Mr. Freedman. This would be your position?
> A: Exactly
> A: (cont'd) You know that we, we even got a check from Varah on that thing, a settle-

ment of account—you see, so I am not taking Freedman's part. He was a—I think he was taught.
A: (Lynch) Why it was paid, you found out. I know that he did sell the fund. I know that he paid by, uh—but if I had been in Cuba, and Freedman said the case—give this man $3500, we would have given it to him.

er's contentions in this respect are without merit. Nor do we believe that we must draw any impermissible or derogatory conclusions from McIlvenna's failure to appear since affidavits are clearly admissible and petitioner has no right to demand the presence and testimony of foreign witnesses.

Petitioner also strenuously objects to the probable cause finding with respect to the elements of reliance and damage suffered by Growth Equity in connection with the alleged fraud. Fahrquaharson, in his affidavit, stated that he would not have purchased the shares of Buffalo had he known that a secret commission was to be paid in connection with the transaction and that he relied on the representations of Danny King in purchasing the stock. Petitioner produced a Mr. Kirby, the "right-hand" man of Varah during the time period in question who testified that there was a ten-day hiatus between the time when Fahrquaharson was first approached by King and the consummation of the purchase. He further testified that the Fund had conducted an independent investigation as to the merits of the stock, including an examination of the report on Buffalo made by Quillian & Boychec, a well-known independent engineering and consulting firm in Canada. Kirby also stated that it was common practice in Canada at the time in question for an extra ten per cent commission to be paid to a broker in connection with placing a large block of shares to an institutional investor.

The question of what evidence is sufficient to constitute probable cause is not susceptible to easy determination, but it has been stated that evidence which "tends to obliterate probable cause may be considered but not merely [that which] contradicts it." *Shapiro v. Ferrandina, supra,* 355 F.Supp. at 572. Moreover, the question of reliability may come into focus since "the improbability or vagueness of testimony may destroy the probability of guilt"; however, the mere presentation of witnesses who testify as to an opposite version of facts will not. *Id.* The resolution of such conflicts in evidence must await a trial on the merits.

The issue of reliance is uniquely a factual determination that is best left for the defense of the trial on the merits. Petitioner's contention herein is indistinguishable from that rejected in *Hatfield v. Guay, supra,* which involved facts strikingly similar to those *sub judice.* In *Hatfield,* the fugitive was sought for extradition to Canada on the charge of obtaining money by false pretenses in presenting an allegedly false claim for damages to the government stating that his ship had been destroyed by a German submarine. The relator sought to introduce evidence that the Canadian government had not acted on the false representations, but had acted upon an independent investigation and award made by a Commissioner and approved by Parliament. The court concluded that the conflicting evidence created a question of fact as to whether the Canadian government had paid the money on the basis of the false claim or whether it had done so solely in reliance upon its own investigation and award of payment. *Id.* at 362. *See Kelly v. Griffin,* 241 U.S. 6, 36 S.Ct. 487, 60 L.Ed. 861 (1916). Fahrquaharson stated in his affidavit that he would not have purchased the stock had he known that King had received a secret commission, and the fact that he made an independent investigation only creates an issue of fact which may be raised as a defense. In any event, under analogous circumstances in the context of the federal securities laws, it is well settled that in nondisclosure cases such as that *sub judice,* reliance need not be independently shown, but will be presumed if the omitted fact was material to the investment decision.

Moreover, we reject petitioner's contention that there was insufficient evidence upon which to base a probable cause finding that the Fund was damaged by the scheme. In the first instance, the Fund was evidently damaged in the sense that it suffered an economic or pecuniary loss by selling at less than the price at which it had purchased the stock. The fact that the Fund disposed of some of its shares prior to learning of the secret commission or that such shares were sold at a profit would not obliterate the finding of probable cause. By analogy again to the American securi-

ties laws, it is well settled that damage is to be computed as of the day when the fraud was discovered or reasonably could have been discovered. *Richardson v. McArthur*, 451 F.2d 35 (10th Cir. 1971). Moreover, there is no requirement that the investor sell his stock at the time he learns of the fraud, but his damages will, of course, be limited in accordance with the foregoing rule. *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591 (3d Cir. 1976). The purported lack of any damages may be raised as a defense to the Canadian proceedings.

## THE CANADIAN ACQUITTAL

Petitioner has also argued that the acquittal of the four other persons charged in connection with the transactions *sub judice* by the Supreme Court of Ontario on November 10, 1976, conclusively precludes a finding of probable cause or at least compels dismissal of the indictment on grounds of collateral estoppel. *See Asselin v. Jenkins, supra.* The committing magistrate excluded evidence of the opinion of the Canadian judges in connection with the acquittal of the four other alleged perpetrators.

▮ The precise scope of the evidence which the fugitive may introduce is largely committed to the discretion of the magistrate. *E. g., United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963) *cert. denied*, 376 U.S. 952, 84 S.Ct. 969, 11 L.Ed.2d 971; *Shapiro v. Ferrandina*, 355 F.Supp. at 572. Since the standard of proof is more stringent in a criminal prosecution than that required for a determination of probable cause, the Canadian acquittal would not obliterate a finding of probable cause. In any event, as long as there remains competent evidence to sustain the burden of establishing probable cause, even the erroneous exclusion of other evidence will not render the detention illegal. *E. g., Charlton v. Kelly*, 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Shapiro v. Ferrandina*, 355 F.Supp. at 572. Concomitantly, we do not find it offensive to our system of criminal justice to allow a codefendant to go to trial after the alleged coperpetrators or coconspirators have been acquitted. In fact, both Georgia law and federal law recognize that the acquittal of one party to a crime does not bar the prosecution and conviction of another party to the crime in separate and distinct trials. *E. g.*, Ga.Code Ann. § 26–802; nor is the doctrine of collateral estoppel available against the Crown herein, because of the principle of mutuality of estoppel. Under the mutuality doctrine, since Canada could not have asserted the benefit of an estoppel if petitioner's confederates had been convicted, neither can petitioner assert the benefit of their acquittal as a bar to prosecution. Nor did the Canadian trial involve the same parties. *Compare Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

We agree with petitioner that the record before us is not overly convincing of petitioner's guilt and complicity or that we may dispassionately ignore petitioner's plaintive cries of prejudice and unequal dealing at the hands of the Canadian government. Nevertheless, they do not warrant a departure from the magistrate's determination of probable cause. Such arguments, to the extent that they question the reasons for seeking extradition as being political in nature, are best left to executive discretion. *Cf. Sweeney v. Woodall*, 344 U.S. 86, 73 S.Ct. 139, 97 L.Ed. 114 (1952).

Accordingly, for the reasons hereinabove expressed petitioner's application for habeas corpus relief is hereby DENIED.

IT IS SO ORDERED.